ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL IV

| | | |
|---|---|---|
| RADAMES ALMANZAR Y MARILIS VENTURA OBIERO<br><br>Parte Apelada<br><br>v.<br><br>ESTADO LIBRE ASOCIADO DE PUERTO RICO Y SU DEPARTAMENTO DE RECURSOS NATURALES Y OTROS<br><br>Parte Apelante | KLAN202300643 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Carolina<br><br>Civil Núm.: CA2020CV01631<br><br>Sobre: Usucapión |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y el Juez Rodríguez Flores.

Rodríguez Flores, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 13 de mayo de 2024.

Comparece el Departamento de Recursos Naturales y Ambientales, representado por la Oficina del Procurador General, y solicita que revoquemos la *Sentencia Sumaria* emitida y notificada el 23 de mayo de 2023, por el Tribunal de Primera Instancia (TPI), Sala Superior de Carolina. Mediante el referido dictamen, el foro primario resolvió que la parte apelada, Radamés Almanzar Medina y su esposa Marilis Ventura Oviedo, adquirió el predio objeto del presente pleito mediante prescripción adquisitiva o usucapión.

La parte apelada compareció mediante escrito en oposición al recurso.

Evaluados los planteamientos de las partes, así como los documentos que forman parte del expediente, confirmamos la *Sentencia Sumaria* apelada.

**I.**

El 7 de agosto de 2020, el señor Radamés Almanzar Medina y su esposa Marilis Ventura Oviedo (esposos Almanzar-Ventura)

presentaron una demanda en contra el Estado Libre Asociado de Puerto Rico (ELA) y su Departamento de Recursos Naturales y Ambientales (DRNA), como sucesor de la Compañía de Parques Nacionales. En síntesis, reclamaron la titularidad mediante prescripción adquisitiva sobre un predio que forma parte de la finca de mayor cabida número 7869, inmatriculada al folio 161 del tomo 147 de Loíza, Registro de la Propiedad de Carolina (Sección Tercera) a favor de la Compañía de Fomento Recreativo, hoy Programa de Parques Nacionales de Puerto Rico, adscrito al DRNA. El predio en cuestión no se encuentra inscrito como finca independiente en el Registro de la Propiedad.[1]

Según las alegaciones, la posesión original del predio sobre el cual se reclama titularidad la tuvo el tronco familiar de don Francisco París Pizarro. En o alrededor del 1970, éste vendió el terreno a la familia Monzón Castro. A su vez, dicha familia se lo vendió a los esposos Almanzar-Ventura, mediante contrato privado suscrito el 18 de mayo de 2012. En su demanda, los esposos Almanzar-Ventura adujeron que, al igual que sus predecesores, han poseído el predio desde antes del 1910 y hasta el presente, de manera pública, pacífica, ininterrumpida y en concepto de dueños. Por lo anterior, razonaron que adquirieron la propiedad por usucapión y solicitaron al tribunal que los declarara dueños en pleno dominio del predio.

---

[1] Conforme a la alegación número 12 de la demanda, los esposos Almanzar-Ventura aseveraron que, el 2 de octubre de 2018, el ingeniero Pedro J. Dávila Colón (número de licencia 9325), preparó un plano de mensura para delimitar el predio sobre el cual se reclama titularidad mediante prescripción adquisitiva o usucapión. El referido plano de mensura refleja la siguiente descripción:

> Predio localizado en el Barrio Torrecilla Baja, Sector Piñones, del municipio de Loíza, Puerto Rico, con un área superficial de 1227.9799 metros cuadrados, equivalentes a 0.3124 cuerdas. Colinda por el Norte, con terrenos de Radames Almanzar y Marilis Ventura Obiero, por el Este con terrenos de José Rolando Ferrer Pagán, por el Sur, con terrenos de José Ferrer y camino público y por el Oeste, con terrenos inscritos a favor de la Compañía de Fomento Recreativo de Puerto Rico, ocupados por la Sra. Nereida Ortiz.

Véase, *Demanda,* apéndice del recurso, págs. 1-6, a las págs. 4-5.

El 9 de noviembre de 2020, el ELA presentó su contestación a la demanda y negó la mayoría de las alegaciones. Afirmativamente, alegó que la titularidad del predio en controversia la ostenta el Estado y que ello es conocido por los esposos Almanzar-Ventura, razón por la cual, arguye que la posesión del terreno no ha sido en concepto de dueño. Así también, afirmó que constituye la opinión pública y creencia colectiva generalizada y reconocida en la comunidad que los terrenos pertenecen al Estado. El ELA añadió que la presunta posesión por parte de los esposos Almanzar-Ventura tampoco ha sido de forma ininterrumpida durante 30 años, conforme requiere el estado de derecho prevaleciente, puesto que, conforme a las alegaciones de la demanda, ocurrió una interrupción civil por el reconocimiento expreso y tácito que los poseedores han hecho del derecho del dueño (el Estado). El ELA puntualizó que la supuesta posesión se efectuó por la mera tolerancia o autorización del Estado, lo que hacía que no se configurara la posesión en concepto de dueño a favor de los esposos Almanzar-Ventura. Por lo anterior, concluyó que no se cumplían los requisitos de la prescripción adquisitiva o usucapión.

Igualmente, el ELA arguyó que el predio en cuestión es un bien de dominio público destinado a uso público, y que, por dicha condición, no puede adquirirse mediante prescripción adquisitiva o usucapión. Por último, planteó que la reclamación constituía cosa juzgada toda vez que la controversia objeto del presente litigio pudo ser dilucidada en el caso *Radhamés Almanza Medina v. Compañía de Parques Nacionales,* FAC2002-1228, resuelto mediante sentencia del 13 de agosto de 2010.[2]

Las partes tuvieron la oportunidad de realizar un amplio descubrimiento de prueba. El 18 de enero de 2022, presentaron el

---

[2] El ELA solicitó al tribunal que tomara conocimiento judicial del citado caso.

*Informe sobre Conferencia Preliminar entre Abogados y Abogadas,* en el que estipularon varios hechos[3] y prueba documental[4]. El 24 de enero de 2022, se celebró la conferencia con antelación al juicio, donde las partes anunciaron que el caso era uno propicio para resolverse por la vía sumaria y que presentarían las respectivas mociones dispositivas.

Luego de varios incidentes procesales, el 2 de junio de 2022, el ELA instó una *Solicitud de Sentencia Sumaria.* En ésta, propuso

---

[3] Los hechos estipulados fueron los siguientes:

1. Los demandantes son dueños de un terreno en el que ubica un local comercial sito en el Barrio Torrecilla Baja, Sector Piñones, del Municipio de Loíza, el cual fue adquirido mediane sentencia dictada en el caso FAC2002-1228. Dicho predio colinda con el predio objeto de la presente demanda.

2. El DRNA es sucesor del Programa de Parques Nacionales del Departamento de Recreación y Deportes. Este último, sustituyó a las Compañía de Parques Nacionales, que a su vez ocupó el lugar de la Compañía de Fomento Recreativo. Así también, se acepta que el predio de terreno en controversia forma parte de una finca de mayor cabida, inscrita en el Registro de la Propiedad a favor de la Compañía de Fomento Recreativo de Puerto Rico.

3. El predio de terreno en controversia en el presente caso forma parte de una finca de mayor cabida, inscrita en el Registro de la Propiedad a favor de la Compañía de Fomento Recreativo de Puerto Rico.

4. La Compañía de Fomento Recreativo, que fusionada con el Fideicomiso de Parques en virtud de las leyes 9 y 10 de 8 de abril de 2001 pasó a ser la Compañía de Parques Nacionales, es quien consta como titular único en el Registro de la Propiedad de dicha Parcela "B", cuya descripción y datos actuales de inscripción son los siguientes:

RÚSTICA: Parcela de terreno con cabida superficial de 12.1416 cuerdas. En lindes, por el NORTE, con el Océano Atlántico; por el ESTE, con terrenos de la Autoridad de Tierras de Puerto Rico; por el SUR, con la parcela "A" que por la presente se segrega; y por el OESTE, con el Canal de Cangrejos y el Océano Atlántico. La finca aparece denominada como parcela "B" del plano titulado "Battery Lancaster".

Inscrita a favor de la Compañía de Fomento Recreativo mediante la escritura número 4, sobre segregación y traspaso, otorgada en San Juan el 31 de octubre de 1979 ante el notario Enrique Adsuar Lores, al folio 161 del tomo 147 de Loíza, Registro de la Propiedad de Carolina, Sección Tercera, finca número 7869.

5. Dentro de dicha finca 7869, cuya titularidad registral pasó a favor de la CPN quien pasó al Programa de Parques Nacionales de Puerto Rico, adscrito al Departamento de Recursos Naturales, se ubica el predio objeto del presente litigio.

Apéndice del recurso, a las págs. 40-41.

[4] Documentos estipulados: (1) Escritura Número 4 del 31 de octubre de 1979; (2) Escritura Número 6 del 31 de octubre de 1979; (3) Plano del predio reclamado en este caso, sujeto a que testifique quien lo preparó; (4) Sentencia dictada en el caso FAC 2002-1228 mediante la cual el demandante adquirió por usucapión el predio que colinda con la finca objeto de este pleito; (5) Sentencia dictada en el caso FAC 2002-1229 relacionada con la adquisición por usucapión por parte del Sr. José Ferrer de otro predio que colinda con el terreno objeto del presente caso. *Íd.,* págs. 42-43.

seis (6) hechos incontrovertidos[5] y planteó que, como cuestión de

derecho, procedía que se dictara sentencia sumaria desestimando

---

[5] Los hechos incontrovertidos propuestos por el ELA fueron los siguientes:
1. En 1898, Estados Unidos adquirió todas las tierras de Puerto Rico que eran propiedad de la Corona Española por medio del Tratado de París. En particular el Segundo Artículo del Tratado de París señala lo siguiente: "España cede a los Estados Unidos la Isla de Puerto Rico y las demás que están bajo su soberanía en las Indias Occidentales, y la Isla de Guam en el Archipiélago de las Marianas o Ladrones". Artículo II, Tratado de París de 1898, L.P.R.A., Tomo 1.

> En cumplimiento de lo convenido en los artículos I, II y III de este tratado, España renuncia en Cuba y cede en Puerto Rico y en las otras islas de las Indias Occidentales, en la Isla de Guam y en el Archipiélago de las Filipinas, todos los edificios, muelles, cuarteles, fortalezas, establecimientos, vías públicas y demás bienes inmuebles que con arreglo a derecho son del dominio público, y como tal corresponden a la Corona de España. Artículo VIII, Tratado de París de 1898, LPRA, Tomo 1.

2. La propiedad que se pretende usucapir era de dominio público bajo la Corona de España, como antes mencionado y pasó al Gobierno Federal en virtud del Tratado de París en 1898. Convirtiéndose en "Punta Cangrejos (Battery Lancaster) Military Reservation", la cual era una reserva militar de los Estados Unidos de América y actualmente es parte de "The Harbor Defenses of San Juan". De hecho, consta en "Modern American Seacoast Defenses, A List of Military Reservations and Concrete Gun Batteries 1890-1950".

3. La Compañía de Fomento Recreativo, a través de la Ley 9 y 10 del 8 de abril de 2001 fue fusionada con el Fideicomiso de Parques creándose así la Compañía de Parques Nacionales (en adelante, CPN). Posteriormente, por medio de la Ley 107 de 23 de julio de 2014, según enmendada, el CPN fue convertido en lo que hoy es el Programa de Parques Nacionales de Puerto Rico. Actualmente, administrado por el Departamento de Recursos Naturales y Ambientales en adelante (DRNA). La CPN es propietaria de la finca en controversia, la cual consta inscrita en el Registro de la Propiedad a nombre de la Compañía de Fomento Recreativo antecesora jurídica de la CPN. La cual fue adquirida mediante segregación y traspaso de la Compañía de Fomento Industrial de Puerto Rico a varias agencias entre ellas CFR, por el convenido precio, según las escrituras 4 y 6 otorgadas en San Juan, Puerto Rico el 31 de octubre de 1979 ante el notario Enrique Adsuar Lores. Los acuerdos contenidos en ambas escrituras obligan a CPN a que los terrenos recibidos no pued[a]n ser cedidos, donados ni enajenados en forma alguna a favor del sector privado.

4. El predio de terreno en controversia en la acción de epígrafe es parte de la finca 7869 inscrita en el Registro de la Propiedad a favor de la Compañía de Fomento Recreativo de Puerto Rico. La Compañía de Fomento Recreativo, que fusionada con el Fideicomiso de Parques en virtud de las leyes 9 y 10 de 8 de abril de 2001 pasó a ser la Compañía de Parques Nacionales, es quien consta como titular único en el Registro de la Propiedad de dicha Parcela "B", cuya descripción y datos actuales de inscripción son los siguientes:

> RÚSTICA: Parcela de terreno con cabida superficial de 12.1416 cuerdas. En lindes, por el NORTE, con el Océano Atlántico; por el ESTE, con terrenos de la Autoridad de Tierras de Puerto Rico; por el SUR, con la parcela "A" que por la presente se segrega; y por el OESTE, con el Canal de Cangrejos y el Océano Atlántico. La finca aparece denominada como parcela "B" del plano titulado "Battery Lancaster".
> Inscrita a favor de la Compañía de Fomento Recreativo mediante la escritura número 4, sobre segregación y traspaso, otorgada en San Juan el 31 de octubre de 1979 ante el notario Enrique Adsuar Lores, al folio 161 del tomo

la reclamación de los esposos Almanzar-Ventura por las razones expuestas en la contestación a la demanda. A tales fines, relató que el predio que se pretende usucapir forma parte de una finca de mayor cabida que era de dominio público bajo la Corona de España y así pasó al Gobierno Federal en virtud del Tratado de París en 1898, convirtiéndose en "Punta Cangrejos (Battery Lancaster) Military Reservation", una reserva militar de los Estados Unidos de América que actualmente es parte de "The Harbor Defenses of San Juan". Añadió que el terreno consta enumerado en "Modern American Seacoast Defense, A List of Military Reservations and Concrete Gun Batteries 1890-1950". También, señaló que, desde el 23 de septiembre de 1977, el predio es destinado a uso público según designado por la Junta de Planificación.

El ELA puntualizó que el predio sobre el cual los esposos Almanzar-Ventura reclaman titularidad mediante prescripción adquisitiva está comprendido dentro de un inmueble inscrito en el Registro de la Propiedad a favor de la Compañía de Fomento Recreativo, antecesora de la Compañía de Parques Nacionales y del actual DRNA. La descripción y datos de inscripción del inmueble son los siguientes:

> RÚSTICA: Parcela de terreno con cabida superficial de 12.1416 cuerdas. En lindes, por el NORTE, con el Océano Atlántico; por el ESTE, con terrenos de la Autoridad de Tierras de Puerto Rico; por el SUR, con la parcela "A" que por la presente se segrega; y por el OESTE, con el Canal de Cangrejos y el Océano Atlántico. La finca aparece denominada como parcela "B" del plano titulado "Battery Lancaster".
>
> Inscrita a favor de la Compañía de Fomento Recreativo mediante la escritura número 4, sobre segregación y traspaso, otorgada en San Juan el 31 de octubre de

---

147 de Loíza, Registro de la Propiedad de Carolina, Sección Tercera, finca número 7869.

5. Desde el 23 de septiembre de 1977 los terrenos en controversia son destinados a uso público según designados por la Junta de Planificación.

6. La presente controversia pudo ser litigada en el caso de *Radhamés Almanza v. Compañía de Parques Nacionales del ELA* FAC2022-1228, constituyendo así cosa juzgada.

*Íd.,* págs. 59-60.

1979 ante el notario Enrique Adsuar Lores, al folio 161 del tomo 147 de Loíza, Registro de la Propiedad de Carolina, Sección Tercera, finca número 7869.

A su vez, el ELA explicó que los acuerdos contenidos en las escrituras de segregación y traspaso de la finca 7869 prohíben que ésta sea cedida, donada o enajenada a favor del sector privado. Esto, sumado a los planteamientos de que un bien destinado a uso público no está sujeto a usucapión, que no se configuró la posesión en concepto de dueño y que la reclamación constituye cosa juzgada, condujeron al ELA a argüir que no existían hechos medulares que impidieran la desestimación sumaria del pleito. Con su escrito en solicitud de sentencia sumaria, el ELA acompañó copia de documentos en apoyo de lo alegado.[6]

Por su parte, los esposos Almanzar-Ventura presentaron una *Oposición a Moción de Sentencia Sumaria de la Parte Demandada y Solicitud de Sentencia Sumaria a Favor de los Demandantes.* Adujeron que existía controversia sobre los hechos propuestos por el ELA, razón por la cual debía denegarse la solicitud de sentencia sumaria instada y que, por el contrario, procedía declarar que no existía controversia sobre los hechos propuestos en la oposición[7] y

---

[6] Los documentos que el ELA acompañó con su solicitud de sentencia sumaria fueron: Modern American Seacoast Defense, A List of Military Reservations and Concrete Gun Batteries 1890-1950; Escrituras Núm. 4 y 6, ambas sobre Segregación y Traspaso, y otorgadas el 31 de octubre de 1979, ante el notario Enrique Adsuar Lores,Certificación del Registro de la Propiedad; Certificación de zonificación expedida el 30 de marzo de 1993 por la Junta de Planificación; y la sentencia emitida por el TPI en el caso *Radamés Almanza Medina v. Compañía de Parques Nacionales,* FAC2002-1228.

[7] Los hechos propuestos por los esposos Almanzar-Ventura fueron los siguientes:

a- Al 31 de octubre de 1979, [l]a Compañía de Fomento Industrial de Puerto Rico figuraba como titular registral de una parcela de terreno conocida como "Battery Lancaster" compuesta de 15.53 cuerdas e inscrita a su favor al folio 192 del tomo 3 de Canóvanas, finca número 7441, según los datos de inscripción en dicho momento.

b- En dicha fecha, [l]a Compañía de Fomento Industrial de Puerto Rico segregó una finca de 3.3884 cuerdas, la cual se denominó Parcela "A" en el plano de segregación, quedando un remanente de 12.1416 cuerdas, el cual se denominó Parcela "B" en el plano de segregación, todo ello según consta de la escritura número cuatro (4) de 31 de octubre de 1979, otorgada en San Juan ante el notario Enrique Adsuar Lores.

c- Conforme la citada escritura número cuatro mencionada en el párrafo anterior, la Compañía de Fomento Industrial de Puerto Rico cedió la Parcela "A" a favor de la Compañía de Desarrollo

Comercial de Puerto Rico y el remanente o sea, la Parcela "B", lo cedió a favor de la Compañía de Fomento Recreativo.

d- La cláusula cuarta de la citada escritura número cuatro, mencionada en los párrafos anteriores, establece lo siguiente:

La Compañía de Desarrollo Comercial y la Compañía de Fomento Recreativo entrarán en posesión de los inmuebles aquí transferídoles, libre de costos y por el solo acto del otorgamiento de esta escritura sin ulterior requerimiento o formalidad, **reconociendo expresamente la presencia y/o permanencia de personas ("squatters") y estructuras ubicadas en las parcelas objeto de cesión** por lo que renuncian a todo y cualquier derecho que le asista o le pueda asistir en el futuro, al saneamiento del bien objeto de cesión y traspaso. Las Cesionarias relevan expresamente a la Compañía de toda y cualquier responsabilidad en relación con la citada presencia o permanencia de dichas personas y estructuras en las fincas objeto de traspaso siendo por cuenta de dichas Cesionarias la responsabilidad incidental a la remoción, relocalización o gestión otra alguna para con las citadas personas, incluyendo la indemnización que por el valor de las estructuras o en pago otro alguno se venga obligado a desembolsar.

**En adición, las Cesionarias reconocen la existencia de varios litigios radicados por terceras personas que envuelven asuntos relativos al título, uso y disfrute de las parcelas objeto de cesión así como de las estructuras en ella enclavadas**. Las Cesionarias asumen la defensa o presentación de los casos que afecten las parcelas cedidas a virtud de la presente escritura, según sea requerido, relevando a la Compañía de obligación o responsabilidad otra alguna en torno a los mismos.

e- La Compañía de Fomento Recreativo – fusionada con el Fideicomiso de Parques en virtud de las leyes 9 y 10 de 8 de marzo de 2001, pasando a ser la actual Compañía de Parques Nacionales (CPN) – consta como titular único en el Registro de la Propiedad de dicha Parcela "B", cuya descripción y datos actuales de inscripción son los siguientes:

**RÚSTICA: Parcela de terreno con cabida superficial de 12.1416 cuerdas. En lindes, por el NORTE, con el Océano Atlántico; por el ESTE, con terrenos de la Autoridad de Tierras de Puerto Rico; por el SUR, con la parcela "A" que por la presente se segrega; y por el OESTE, con el Canal de Cangrejos y el Océano Atlántico. La finca aparece denominada como parcela "B" del plano titulado "Battery Lancaster".**

**Inscrita a favor de la Compañía de Fomento Recreativo mediante la escritura número 4, sobre segregación y traspaso, otorgada en San Juan el 31 de octubre de 1979 ante el notario Enrique Adsuar Lores, al folio 161 del tomo 147 de Loíza, Registro de la Propiedad de Carolina, Sección Tercera, finca número 7869.**

f- Dentro de dicha finca 7869, cuya titularidad registral quedó sucedida a favor de la aquí demandada según expuesto en el párrafo anterior, se ubica el predio objeto del presente litigio.

g- El demandante y su esposa le compraron a la familia Monzón, el predio objeto del presente litigio mediante contrato titulado "Contrato de Compraventa de Bien Inmueble" suscrito en San Juan, Puerto Rico, el 18 de mayo de 2012.

h- La familia Monzón, a su vez, había adquirido previamente, el predio objeto del presente litigio de don Francisco París Pizarro en donde operaron un negocio conocido como el Gran Chaparral, por alrededor de 30 años.

i.- El predio objeto del presente litigio, descrito en la demanda y en el plano de mensura que se acompaña con esta moción (se identifica como Lote A) y sobre el cual el demandante reclama titularidad mediante prescripción adquisitiva, forma parte de la finca 7869 ya inmatriculada en el Registro de la Propiedad.

j- El plano de mensura incluido como **Anejo 3 de esta moción**, el cual fue preparado por Pedro Dávila Colón y Joel Nieves, con números de licencia 9323 y 3029 respectivamente, refleja fielmente

la ubicación exacta, descripción y situación del predio objeto del presente litigio, con expresión de coordenadas terrestres, linderos y cabida. Del mismo puede formularse la siguiente descripción:

> **Lote A: Predio localizado en el Barrio Torrecilla Baja, Sector Piñones, del municipio de Loíza, Puerto Rico, con un área superficial de 1227.9799 metros cuadrados, equivalentes a 0.3124 cuerdas. Colinda por el Norte, con terrenos de Radames Almanzar y Marilis Ventura Obiero, por el Este con terrenos de José Rolando Ferrer Pagán, por el Sur, con terrenos de José Ferrer y camino público y por el Oeste, con terrenos inscritos a favor de la Compañía de Fomento Recreativo de Puerto Rico, ocupados por la Sra. Nereida Ortiz.**

k- El predio objeto del presente litigio no forma parte de la zona marítimo terrestre ni está afectado por ésta.

l- La presencia y posesión del tronco familiar de don Francisco París Pizarro así como de la esposa de éste, doña Gertrudis Escalera, se remonta a principios del siglo 20, o tal vez, a finales del siglo 19.

m- Don Francisco París Pizarro, también conocido como Francisco Javier París Escalera y como "Don Panchito", nació el 3 de diciembre de 1911. Hijo de don Juan de Matta París Ayala y doña Aquilina Pizarro, también conocida como Aquilina Escalera, vivió toda su vida en las tierras en que ubica el predio objeto del presente litigio; primeramente junto a sus padres, de los cuales eventualmente lo adquirió, y posteriormente con su esposa doña Gertrudis Escalera, hasta su fallecimiento el 2 de junio de 1983. Doña Gertrudis falleció al día siguiente o sea, el 3 de junio de 1983.

n- Don Francisco París Escalera aparece listado en el Décimoquinto Censo de los Estados Unidos efectuado en 1930 como hijo de los también listados esposos Juan París Ayala y Aquilina Pizarro, todos como residentes del Barrio Torrecilla Baja del Municipio de Loíza; igualmente en el Censo Social y de Población de 1935 efectuado por la Administración de la Reconstrucción de Puerto Rico. Don "Juan Pariz Ayala" así como doña "Aquilina Escalera y Rivera de Pariz" (sic) aparecen también listados en el Censo Décimotercero de los Estados Unidos efectuado en 1910 como esposos y residentes del mismo barrio y municipalidad, en el "camino vecinal que conduce de Loíza a San Juan".

o- Todos los poseedores anteriores del predio objeto del presente litigio: don Juan de Matta París y su esposa doña Aquilina; don Francisco París Pizarro y su esposa doña Gertrudis Escalera; y la familia Monzón, mantuvieron sucesivamente la posesión continua del predio objeto del presente litigio, desde antes de 1910 y hasta 2012, en concepto de dueños, pública, pacífica e ininterrumpidamente. Igualmente el demandante y su esposa han mantenido y continuado la posesión con los mismos atributos y condiciones desde 2012 y hasta el presente los demandantes han continuado usando el predio adquirido de la Familia Monzón como estacionamiento del negocio de restaurante que adquirieron por sentencia que declaró la usucapión de parte de la finca objeto de este pleito.

p- Los demandantes son dueños de un terreno en el que ubica un local comercial sito en el Barrio Torrecilla Baja, Sector Piñones, del municipio de Loíza, el cual fue adquirido mediante la sentencia dictada en el caso FAC2002-1228. Dicho predio colinda con el predio objeto de la presente demanda.

q- El DRNA es sucesor del Programa de Parques Nacionales del Departamento de Recreación y Deportes. Este último, sustituyó a la Compañía de Parques Nacionales, que a su vez ocupó el lugar de la Compañía de Fomento Recreativo. Así también, se acepta que el predio de terreno en controversia forma parte de una finca de mayor cabida, inscrita en el Registro de la Propiedad a favor de la Compañía de Fomento Recreativo de Puerto Rico.

r- El predio de terreno en controversia en el presente caso forma parte de una finca de mayor cabida, inscrita en el Registro de la Propiedad a favor de la Compañía de Fomento Recreativo de Puerto Rico.

s- Dentro de dicha finca 7869, cuya titularidad registral pasó a favor de la CPN quien pasó al Programa de Parques Nacionales de

dictar sentencia decretando a favor de los demandantes la usucapión sobre el predio en controversia. En síntesis, afirmaron que el predio objeto de la demanda es un bien patrimonial del Estado sujeto a usucapión. Además, aseveraron que el ELA no ha presentado prueba suficiente para concluir que el terreno está dedicado al uso público. Por último, arguyeron que en el presente caso la doctrina de cosa juzgada opera a favor de la parte demandante y no a favor del ELA.

Específicamente, en cuanto a los hechos incontrovertidos propuestos por el ELA, los esposos Almanzar-Ventura indicaron que los primeros cuatro eran impertinentes y los últimos dos incorrectos. Señalaron que el ELA sustentó los hechos propuestos como incontrovertidos con documentos que no establecen lo que se pretende probar o con evidencia inadmisible. Así, por ejemplo, señalaron que resulta impertinente que el terreno hubiera sido transferido en el 1898 por la Corona Española a los Estados Unidos, porque las Escrituras de Segregación y Traspaso Números 4 y 6, otorgadas el 31 de octubre de 1979, demostraban que el terreno en controversia es un bien patrimonial del Estado (en específico, de la Compañía de Fomento Industrial) desde principios de la década del 1960.

Respecto a los documentos que acompañó el ELA con su solicitud de sentencia sumaria para sustentar su alegación de que el predio en controversia está destinado a uso público, los esposos Almanzar-Ventura indicaron que el "Modern American Seacoast Defense, A List of Military Reservations and Concrete Gun Batteries

---

Puerto Rico, adscrito al Departamento de Recursos Naturales, se ubica el predio objeto del presente litigio.

t- La prueba aquí sometida ha dejado establecido en forma clara que la posesión en concepto de dueño tanto del demandante como de sus predecesores, más allá de la interioridad de la creencia subjetiva de los poseedores, constituye la opinión pública y creencia colectiva generalizada y reconocida en la comunidad. (Énfasis original).

*Íd.*, págs. 150-155.

1890-1950" no es una publicación oficial del gobierno federal o estatal, y tampoco especifica la ubicación de la supuesta facilidad militar en una finca que, según la Escritura Número 6, tiene una cabida de 900 cuerdas. Resaltaron que el propio autor del documento reconoce que su contenido puede tener errores y omisiones y que, por tal razón, el ELA no puede utilizar dicho escrito para fundamentar el hecho propuesto.

Según articularon los esposos Almanzar-Ventura, lo que realmente establecen las Escrituras Números 4 y 6, y la certificación registral presentadas en apoyo a la solicitud de sentencia sumaria del ELA, es que no existe controversia en cuanto a que el titular de la finca 7869 es la Compañía de Fomento Recreativo y, por ende, un bien patrimonial del Estado que puede ser adquirido mediante prescripción adquisitiva o usucapión.

Siguiendo esa línea, y en lo concerniente al documento de la Junta de Planificación (que establece que determinados terrenos son de uso público desde el 1977), los esposos Almanzar-Ventura mencionaron que el documento constituye prueba *self serving* dirigida a establecer el uso público de determinados terrenos, pero en el que no se menciona específicamente el predio objeto del presente caso.

Los esposos Almanzar-Ventura arguyeron que para el 1977, ya se había consumado la usucapión del predio en controversia porque sus antecesores en la posesión lo disfrutaban en concepto de dueños desde principios del siglo 20. También articularon que en el presente caso no aplica la doctrina de cosa juzgada, ya que la sentencia del caso *Radhamés Almanza Medina v. Compañía de Parques Nacionales,* FAC2002-1228[8], se dictó el 13 de agosto de

---

[8] Cabe señalar que la sentencia del caso FAC2002-1228, en específico, resolvió que los esposos Almanzar-Ventura adquirieron mediante prescripción adquisitiva la titularidad sobre el predio identificado en el plano de mensura preparado por el ingeniero y agrimensor Moisés Jordán Molero (número de licencia de ingeniero 2071 y de agrimensor 8215) que se describe a continuación:

2010; es decir, antes de que éstos suscribieran en el 2012 el contrato de compraventa privada sobre el predio objeto del presente pleito.

Para respaldar sus alegaciones, los esposos Almanzar-Ventura acompañaron una declaración jurada suscrita por el señor Ángel Carlos París Escalera[9]; la *Contestación a Interrogatorio y Requerimiento de Producción de Documentos* contestado por el Sr. Radamés Almanzar Medina; carta de cobro por concepto de contribución sobre la propiedad inmueble con número de catastro 042-000-001-01-007, expedida el 8 de mayo de 1998 por el Centro de Recaudación de Ingresos Municipales (CRIM), y dirigida a Francisco París Escalera y/o dueño actual; plano de mensura preparado el 2 de octubre de 2018 por el ingeniero Pedro J. Dávila Colón (número de licencia 9325) respecto al predio sobre el cual se reclama titularidad mediante prescripción adquisitiva o usucapión; copia del contrato privado de compraventa fechado 18 de mayo de 2012; copia de los censos poblacionales de 1910, 1930 y 1935 correspondientes al pueblo de Loíza, que proceden de los Archivos Nacionales de Washington, D.C., y que están depositados en el Centro de Investigaciones Históricas de la Universidad de Puerto Rico, Recinto de Río Piedras; y los certificados de nacimiento de Francisco Javier París Escalera y Gertrudis Escalera, y las actas de defunción de Francisco París y Gertrudis Escalera.

Asimismo, con el propósito de demostrar que el predio no está afecto a un uso público - y, por tanto, sujeto a ser adquirido

---

Predio localizado en el Barrio Torrecilla Baja, Sector Piñones, del municipio de Loíza, Puerto Rico, con un área superficial de 975.406 metros cuadrados, equivalentes a 0.248 cuerdas. Colinda por el Norte, Este y Sur con camino vecinal; y por el Oeste, con Rafael Vizcarrondo. Enclava edificación.

Véase, *Sentencia Final, Íd.*, págs. 131-142, a la pág. 137.

[9] En dicha declaración jurada, el Sr. París Escalera expresa que es nieto de don Juan de Matta París y doña Aquilina Pizarro Escalera, quienes eran dueños del terreno objeto de este caso, y que su abuelo dedicó dicho terreno a la crianza de cerdos, que eventualmente abandonó dicha actividad, pero permaneció en posesión del terreno, hasta que le cedió la posesión al Sr. Eugenio Monzón, quien operó en ese lugar un negocio llamado El Gran Chaparral por treinta (30) años. *Íd.,* págs. 164-165.

mediante prescripción adquisitiva - los esposos Almanzar-Ventura incluyeron una foto aérea del lugar que revela que en los alrededores del predio en controversia operan varios establecimientos comerciales, entre los que se encuentra su negocio dedicado a restaurante, el cual colinda con el predio objeto de este caso[10].

Por último, destacaron que las Escrituras de Segregación y Traspaso Números 4 y 6 previamente mencionadas- mediante las cuales el ELA advino propietario de la finca número 7869 – expresamente advirtieron la presencia de personas y estructuras ubicadas en la parcela objeto de cesión, razón por la cual se incluyó una cláusula de relevo de cualquier litigio que dichas personas presentaran sobre asuntos relativos al título, uso y disfrute de la parcela y estructuras objeto de cesión.

En fin, y en apoyo a que se dictara sentencia sumaria a su favor, los esposos Almanzar-Ventura reiteraron que la prueba ofrecida demostró que tanto ellos como sus antecesores han poseído el predio en concepto de dueños, pública, pacífica e ininterrumpidamente, cumpliendo así con los requisitos legales para la adquisición del dominio por usucapión. Por tanto, afirmaron que procedía dictar sentencia sumaria declarando que éstos adquirieron por usucapión la titularidad del predio en controversia.

Posteriormente, los esposos Almanzar-Ventura presentaron una *Moción para Someter Anejo Adicional,* con la que acompañaron copias de las sentencias emitidas por el TPI, Sala de Carolina, en los casos *José Rolando Ferrer Pagán v. Compañía de Parques Nacionales,* FAC2002-1229, y *Radhamés Almanzar Medina v. Compañía de Parques Nacionales,* FAC2002-1228, relacionadas con

---

[10] En su moción, la pareja reconoció que en el predio objeto de este litigio opera el estacionamiento de su restaurante.

la adquisición por prescripción extraordinaria de los predios de terreno contiguos al terreno en controversia.[11]

El 17 de mayo de 2023, el TPI emitió una orden concediendo un breve término a los esposos Almanzar-Ventura para aclarar la descripción correcta del predio, debido a que aquella que surge del inciso 12 de la demanda difería de aquella que surgía del contrato de compraventa, en cuanto a que se invirtieron los dueños que colindan al Oeste y al Este del terreno y, además, en el plano no se indica los nombres de los propietarios de los terrenos que colindan al Este y al Oeste.

Mediante *Moción para Cumplir Orden*, los esposos Almanzar-Ventura esclarecieron que la descripción correcta del predio es la que consta en el párrafo 12 de la demanda, indicando que ésta coincide con el plano de mensura sometido como anejo de la solicitud de sentencia sumaria y la foto aérea que lo acompaña.

Así pues, basado en la evidencia documental, el 23 de mayo de 2023, el TPI acogió la solicitud de los esposos Almanzar-Ventura y dictó *Sentencia Sumaria* a su favor. En su dictamen, formuló las siguientes determinaciones de hechos:

> 1. Los demandantes son dueños de un terreno en el que ubica un local comercial, sito en el barrio Torrecilla Baja, Sector Piñones, del municipio de Loíza, el cual fue adquirido mediante la sentencia dictada en el caso FAC 2002-1228. Dicho predio colinda con el predio objeto de la presente demanda.
>
> 2. El DRNA es sucesor del Programa de Parques Nacionales del Departamento de Recreación y Deportes. Este último, sustituyó a la Compañía de Parques Nacionales, que a su vez ocupó el lugar de la Compañía de Fomento Recreativo.
>
> 3. El predio de terreno en controversia en el presente caso forma parte de una finca de mayor cabida, inscrita en el Registro de la Propiedad a favor de la Compañía de Fomento Recreativo de Puerto Rico.
>
> 4. Dentro de dicha finca 7869, cuya titularidad registral pasó a favor de la CPN, quien luego pasó al Programa de Parques Nacionales de Puerto Rico, adscrito al

---

[11] Apéndice del recurso, págs. 198-224.

Departamento de Recursos Naturales, está ubicado el predio objeto del presente litigio.

5. Para el 31 de octubre de 1979, la Compañía de Fomento Industrial de Puerto Rico figuraba como titular registral de una parcela de terreno conocida como "Battery Lancaster" compuesta de 15.53 cuerdas e inscrita a su favor al folio 192 del tomo 3 de Canóvanas, finca número 7441, según los datos de inscripción en dicho momento.

6. Para la fecha mencionada en el inciso anterior, la Compañía de Fomento Industrial de Puerto Rico segregó una finca de 3.3884 cuerdas, la cual se denominó Parcela "A" en el plano de segregación, quedando un remanente de 12.1416 cuerdas, el cual se denominó Parcela "B" en el plano de segregación, todo ello según consta en la escritura número cuatro (4) de 31 de octubre de 1979, otorgada en San Juan ante el notario Enrique Adsuar Lores.

7. Conforme a la escritura número cuatro, mencionada en el párrafo anterior, la Compañía de Fomento Industrial de Puerto Rico cedió la Parcela "A" a favor de la Compañía de Desarrollo Comercial de Puerto Rico y el remanente, o sea, la Parcela "B", lo cedió a favor de la Compañía de Fomento Recreativo.

8. La cláusula cuarta de la citada escritura número cuatro, mencionada en los párrafos anteriores, establece lo siguiente:

La Compañía de Desarrollo Comercial y la Compañía de Fomento Recreativo entrarán en posesión de los inmuebles aquí transf[erí]doles, libre de costos y por el solo acto del otorgamiento de esta escritura sin ulterior requerimiento o formalidad, **reconociendo expresamente la presencia y/o permanencia de personas ("squatters") y estructuras ubicadas en las parcelas objeto de cesión** por lo que renuncian a todo y cualquier derecho que le asista o le pueda asistir en el futuro, al saneamiento del bien objeto de cesión y traspaso.

Las Cesionarias relevan expresamente a la Compañía de toda y cualquier responsabilidad en relación con la citada presencia o permanencia de dichas personas y estructuras en las fincas objeto de traspaso siendo por cuenta de dichas Cesionarias la responsabilidad incidental a la remoción, relocalización o gestión otra alguna para con las citadas personas, incluyendo la indemnización que por el valor de las estructuras o en pago otro alguno se venga obligado a desembolsar.

**En adición, las Cesionarias reconocen las existencias de varios litigios radicados por terceras personas que envuelven asuntos relativos al título, uso y disfrute de las parcelas objeto de cesión, así como de las estructuras en ella enclavadas.** Las Cesionarias asumen la defensa o representación de los casos que afecten las parcelas cedidas a virtud de la

presente escritura, según sea requerido, relevando a la Compañía de obligación o responsabilidad otra alguna en torno a los mismos.

9. La Compañía de Fomento Recreativo, que fusionada con el Fideicomiso de Parques en virtud de las leyes 9 y 10, del 8 de abril de 2001 pasó a ser la Compañía de Parques Nacionales, **es quien consta como titular único en el Registro de la Propiedad de dicha Parcela "B"**, cuya descripción y datos actuales de inscripción son los siguientes:

**RÚSTICA: Parcela de terreno con cabida superficial de 12.1416 cuerdas. En lindes, por el NORTE, con el Océano Atlántico; por el ESTE con terrenos de la Autoridad de Tierras de Puerto Rico; por el SUR con la parcela "A" que por la presente se segrega; y por el OESTE, con el Canal de Cangrejos y el Océano Atlántico. La finca aparece denominada como parcela "B" del plano titulado "Battery Lancaster".**

**Inscrita a favor de la Compañía del Fomento Recreativo mediante la escritura número 4, sobre segregación y traspaso, otorgada en San Juan el 31 de octubre de 1979 ante el notario Enrique Adsuar Lores, al folio 161 del tomo 147 de Loíza, Registro de la Propiedad de Carolina, Sección Tercera, finca número 7869.**

10. Dentro de dicha finca 7869, cuya titularidad registral quedó sucedida a favor de la parte aquí demandada según expuesto en los párrafos anteriores, se ubica el predio objeto del presente litigio.

11. El demandante y su esposa le compraron a la familia Monzón, el predio objeto del presente litigio mediante contrato titulado "Contrato de Compraventa de Bien Inmueble" suscrito en San Juan, Puerto Rico, el 18 de mayo de 2012.

12. La familia Monzón, a su vez, había adquirido previamente el predio objeto del presente litigio, de don Francisco París Pizarro y allí operaron un negocio conocido como el Gran Chaparral, **por alrededor de 30 años**.

13. El predio objeto del presente litigio, descrito en la demanda y en el plano de mensura que se acompañó con la moción de la parte demandante (se identifica como lote A) y sobre el cual el demandante reclama titularidad mediante prescripción adquisitiva, forma parte de la finca 7869 ya inmatriculada en el Registro de la Propiedad.

14. El plano de mensura, incluido como Anejo 3 de la moción de la parte demandante, el cual fue preparado por Pedro Dávila Colón y Joel Nieves, con números de licencia 9323 y 3029 respectivamente, refleja finalmente la ubicación exacta, descripción y situación del predio objeto del presente litigio, con expresión de

coordenadas terrestres, linderos y cabida. Del mismo puede formularse la siguiente descripción:

**Lote A: Predio localizado en el Barrio Torrecilla Baja, Sector Piñones, del municipio de Loíza, Puerto Rico, con un área superficial de 1227.9799 metros cuadrados, equivalentes a 0.3124 cuerdas. Colinda por el Norte, con terrenos de Radames Almanzar y Marilis Ventura Obiero, por el Este con terrenos de José Rolando Ferrer Pagán, por el Sur, con terrenos de José Ferrer y camino público y por el Oeste, con terrenos inscritos a favor de la Compañía de Fomento Recreativo de Puerto Rico, ocupados por la Sra. Nereida Ortiz.**

15. El predio objeto del presente litigio no forma parte de la zona marítimo terrestre ni está afectado por ésta.

16. La finca donde se encuentra subsumido el predio sobre el que se reclama en este caso había estado en posesión por casi un siglo por los ascendientes del Sr. Francisco París. La presencia y posesión del tronco familiar de don Francisco Pizarro, así como de la esposa de éste, dona Gertrudis Escalera, de quienes adquirió la familia Monzón el predio que vendieron a los aquí demandantes, se remonta a principios del siglo 20.

17. Don Francisco París Pizarro, también conocido como Francisco Javier París Escalera y como "Don Panchito", nació el 3 de diciembre de 1911. Hijo de don Juan de Matta París Ayala y doña Aquilina Pizarro, también conocida como Aquilina Escalera, vivió toda su vida en las tierras en que ubica el predio objeto del presente litigio; primeramente, junto a sus padres, de los cuales eventualmente lo adquirió, y posteriormente con su esposa dona Gertrudis Escalera, hasta su fallecimiento el 2 de junio de 1983. Doña Gertrudis falleció al día siguiente, o sea, 3 de junio de 1983.

18. Don Francisco París Escalera aparece listado en el Decimoquinto Censo de los Estados Unidos efectuado en 1930, como hijo de los también listados esposos Juan París Ayala y Aquilina Pizarro, todos como residentes del Barrio Torrecilla Baja del Municipio de Loíza; igualmente en el Censo Social y de Población de 1935 efectuado por la Administración de la Reconstrucción de Puerto Rico. Don "Juan Pariz Ayala" así como dona "Aquilina Escalera y Rivera de Pariz" (sic) aparecen también listados en el Censo Decimotercero de los Estados Unidos efectuado en 1910 como esposos y residentes del mismo barrio y municipalidad, en el "camino vecinal que conduce de Loíza a San Juan."

19. Todos los poseedores anteriores del predio objeto del presente litigio: don Juan de Matta París y su esposa doña Aquilina; don Francisco París Pizarro y su esposa doña Gertrudis Escalera; y la familia Monzón, mantuvieron sucesivamente la posesión continua del predio objeto del presente litigio, desde antes de 1910 y hasta 2012, en concepto de dueños, pública, pacífica e ininterrumpidamente. Al inicio del siglo pasado era

usado para la crianza de cerdos por el Sr. Juan de Matta y su esposa, pasando luego a su hijo Francisco París, quien lo cedió a la familia Monzón. Igualmente, el demandante y su esposa han mantenido y continuado la posesión con los mismos atributos y condiciones desde 2012 y hasta el presente, usando el predio adquirido de la Familia Monzón como estacionamiento del negocio de restaurante que adquirieron por sentencia que declaró la usucapión de una parte de la misma finca objeto de este pleito.

20. La prueba sometida por la parte demandante, unida a parte de la prueba sometida por los demandados, así como la prueba que obra en el expediente del presente caso, ha dejado establecido en forma clara que la posesión en concepto de dueño tanto del demandante como de sus predecesores, más allá de la interioridad de la creencia subjetiva de los poseedores, constituye la opinión pública y creencia colectiva generalizada y reconocida en la comunidad.

21. Estimando el año 1910 como el de inicio de las posesiones sucesivas ininterrumpidas de los demandantes y sus predecesores posesorios, podríamos concluir que la usucapión se consumó en 1940; ganada por su poseedor de entonces, transmitida posteriormente a la Familia Monzón y finalmente, mediante cesión por compraventa en el 2012 al demandante y su esposa. Comoquiera, dada la naturaleza misma de la usucapión y aplicada a los hechos del presente caso, tanto los demandantes como cualquiera de sus predecesores posesorios podrían adecuar su consumación para culminarla en cualquier fecha posterior a 1940. Adviértase que en 1979, cuando se otorgó la Escritura Número 4 antes mencionada, se reconoció la presencia de poseedores en dicha finca y se advirtió a los demandados que éstos reclamaban derechos sobre estas tierras, inclusive si se tomara esa fecha como inicio del término de 30 años para la usucapión, la misma se consumó a favor de la familia Monzón en el año 2009, tres años antes de éstos haber vendido su propiedad a los aquí demandantes, quienes han estado en posesión de la misma en concepto de dueños hasta el día de hoy. (Énfasis original).[12]

El foro apelado concluyó que la prueba documental había establecido la concurrencia de todos los atributos requeridos, mantenidos durante el tiempo y con arreglo a las condiciones que requiere la ley, para configurar la adquisición mediante usucapión extraordinaria a favor de los esposos Almanzar-Ventura sobre el predio objeto de este litigio. El TPI aludió a porciones específicas de la declaración jurada del Sr. Ángel París, en las que éste señaló que

---

[12] Véase, *Sentencia Sumaria, Íd.,* págs. 230-238, a la pág. 234.

"el predio que se describe en la demanda del presente caso perteneció originalmente a mis abuelos paternos, Don Juan De Matta París Ayala y Doña Aquilina Pizarro Escalera, también conocida como Aquilina Pizarro París y como Aquilina Escalera" y que "durante mis años de Infancia, mi abuelo dedicó dicho terreno a la crianza de cerdos, actividad que eventualmente descontinuó aunque permaneció en la posesión del predio hasta que cedió dicha posesión al Sr. Eugenio Monzón, quien operó el Negocio El Gran Chaparral en el lugar por alrededor de 30 años".

También el TPI resaltó que la Escritura Número 4 mencionaba la existencia de personas ubicadas en la finca objeto de cesión y que no se había presentado evidencia de que hubiera ocurrido una interrupción de la posesión llevada a cabo por los antecesores de los esposos Almanzar-Ventura, como tampoco que se hubiera realizado una acción afirmativa por parte del ELA para reclamar el derecho como dueño del terreno. Por último, concluyó que el ELA no logró establecer que dichos terrenos pertenecían al gobierno federal, ya que el predio está inscrito a favor de la Compañía de Fomento Recreativo. En resumen, el TPI concluyó que el ELA no presentó prueba suficiente que controvirtiera la consumación de la usucapión a favor de los esposos Almanzar-Ventura, bajo cualquier análisis que se hiciera en cuanto a las fechas (1910, 1940 o 1979). Por tanto, dictó sentencia mediante la cual declaró con lugar la demanda y, consecuentemente, resolvió que los esposos Almanzar-Ventura son dueños en pleno dominio del predio objeto del litigio, según descrito en el plano de mensura preparado por Pedro Dávila Colón y Joel Nieves (números de licencia 9323 y 3029, respectivamente), que hizo formar parte de la sentencia.

Inconforme, el 24 de julio de 2023, el DRNA, representado por la Oficina del Procurador General, instó el presente recurso de apelación, en el que consignó los siguientes señalamientos de error:

> El Tribunal de Primera Instancia erró al dictar sentencia sumaria a favor de la parte apelada y determinar que dicha parte adquirió la titularidad de la finca que es objeto del caso por prescripción extraordinaria, ello a pesar de que la finca en cuestión forma parte de una finca de mayor cabida que está destinada a uso público, razón por la cual, como cuestión de derecho, ésta no es susceptible de adquisición por prescripción extraordinaria.

> El Tribunal de Primera Instancia erró al dictar sentencia sumaria a favor de la parte apelada, cuando esta no presentó evidencia que sustentara que tenía un derecho al remedio solicitado mediante un dictamen sumario, por lo que existen controversias de hechos medulares, lo que, como cuestión de derecho, impedía al foro primario resolver sumariamente este caso.

El 23 de agosto de 2023, los esposos Almanzar-Ventura presentaron el *Alegato de la Parte Apelada*. En síntesis, reprodujeron los planteamientos presentados ante el foro de primera instancia y reiteraron haber cumplido con los requisitos legales para que se configurara la usucapión a su favor sobre el predio en controversia.

**II.**

Comencemos por subrayar que la demanda del caso de autos se presentó el 20 de agosto de 2020, cuando aún regía el derogado Código Civil de 1930[13]. No obstante, el 28 de noviembre de 2020, entró en vigor la Ley Núm. 55-2020, conocida como Código Civil de Puerto Rico (Código Civil de 2020)[14]. Las disposiciones transitorias del nuevo código atienden lo relativo a términos prescriptivos, de caducidad y usucapión en el Artículo 1814, en los siguientes términos:

> Los términos prescriptivos, de caducidad o de usucapión que estén transcurriendo en el momento en que este Código entre en vigor, tienen la duración dispuesta en la legislación anterior; pero si el término queda interrumpido después de la entrada en vigor de este Código, su duración será la determinada en este.[15]

---

[13] 31 LPRA ant. sec. 1 *et seq.*
[14] 31 LPRA sec. 5311 *et seq.*
[15] 31 LPRA sec. 11719.

La controversia planteada en este caso es si se consumó la prescripción extraordinaria o usucapión previo al 20 de agosto de 2020. Por tanto, las disposiciones sobre prescripción extraordinaria aplicables al presente caso son las establecidas en el Código Civil de 1930.

**A.**

Sabido es que nuestro ordenamiento jurídico permite la adquisición del dominio y de todos los derechos reales en virtud de la prescripción adquisitiva o usucapión.[16] Para que esta se configure, es indispensable que estemos ante una cosa o un derecho susceptible de apropiación por un tiempo determinado y según las condiciones que dicta la ley.[17] La prescripción adquisitiva puede ser ordinaria o extraordinaria. Ambos tipos de usucapión "requieren que exista una posesión ininterrumpida, pública, pacífica y en concepto de dueño por el término fijado en la ley".[18] Específicamente, la usucapión ordinaria "requiere la posesión mediante la concurrencia de buena fe y justo título junto al transcurso de diez años según un tiempo fijado por la ley".[19]

En cambio, la prescripción adquisitiva extraordinaria "no requiere el elemento de buena fe ni de justo título, por lo que se le requiere al poseedor un término más prolongado para que pueda adquirir la cosa o el derecho".[20] "En ésta el término requerido es de treinta años para los bienes inmuebles".[21] Requiere, además, que la posesión sea una civil y no natural; es decir, no bastará la mera tenencia de una cosa o un derecho y su disfrute (como ocurre para la posesión natural), sino que es necesario que dicha tenencia esté

---

[16] Artículo 1830 del Código Civil de 1930, 31 LPRA ant. sec. 5241.
[17] *Bravman, González v. Consejo Titulares*, 183 DPR 827, 838 (2011).
[18] *Íd.;* Arts. 1840-1841 del Código Civil de 1930, 31 LPRA ant. secs. 5261-5262.
[19] *Íd.*; Artículo 1857 del Código Civil de 1930, 31 LPRA ant. sec. 5278.
[20] *Bravman, González v. Consejo Titulares,* supra, pág. 839.
[21] *Íd.*; Artículo 1859 del Código Civil de 1930, 31 LPRA ant. sec. 5280.

unida a la intención de hacer suya la cosa o el derecho que se esté poseyendo.[22]

Por tanto, la usucapión requiere que la posesión sea en concepto de dueño porque "sólo la posesión que se adquiere y se disfruta en concepto de dueño puede servir de título para adquirir el dominio".[23] De tal forma, se concibe como dueño en posesión de un inmueble aquel que la opinión general o la percepción pública entienden es el dueño, unido a los actos que éste realice con relación a la propiedad, independientemente de la creencia que pueda tener el propio poseedor.[24]

Por ello, la norma vigente sostiene que los actos de carácter posesorio ejecutados por licencia o mera tolerancia del dueño no son suficientes para cumplir con los requisitos de la prescripción extraordinaria, ya que falta el requisito de la posesión en concepto de dueño. Así pues, todo aquel que posea con permiso, autorización o en representación de otro, no podrá adquirir el dominio, ni ningún otro derecho, por virtud de la prescripción ordinaria o extraordinaria.[25]

Sobre la prescripción adquisitiva en su modalidad extraordinaria, el Tribunal Supremo dispuso lo siguiente:

> …para que se produzca la prescripción extraordinaria que establece el Artículo 1859 del Código Civil de Puerto Rico [supra], deben exigir nuestros tribunales de justicia la prueba de los siguientes hechos: (1) una posesión continuada durante treinta años sobre el inmueble; (2) por haberla así tolerado el dueño del inmueble; (3) ya que el prescribiente ha entrado en posesión del inmueble sin autorización, permiso o licencia otorgados por el dueño o en virtud de contrato celebrado con el dueño; (4) cuya posesión ha mantenido el poseedor en concepto público de dueño, de acuerdo con la creencia colectiva de la comunidad en que vive, no en virtud de la creencia propia que pueda tener el

---

[22] *Adm. Terrenos v. SLG Rivera Morales,* 187 DPR 15, 29 (2012); *Suc. Maldonado v. Suc. Maldonado,* 166 DPR 154, 183 (2005).

[23] *Bravman, González v. Consejo Titulares*, supra, citando a J. Puig Brutau, *Fundamentos de Derecho Civil,* 3ra ed., Barcelona, Ed. Bosch, 1989, T.III, Vol. I, pág. 318.

[24] *Adm. Terrenos v. SLG Rivera Morales,* supra, pág. 29; *Bravman, González v. Consejo Titulares,* supra, pág. 839.

[25] *Íd.*

poseedor de ser el dueño del inmueble poseído y (5) cuya posesión resulte además pública, pacífica y (6) sin que se haya interrumpido naturalmente, o sea, por abandono de la cosa por el poseedor, por más de un año, o civilmente, en virtud de diligencia judicial o notarial, o por un reconocimiento expreso o tácito del derecho del dueño hecho por el poseedor, antes de haber transcurrido los treinta años durante los cuales se consuma la prescripción, y (7) sin que el poseedor haya renunciado expresa o tácitamente a su título por prescripción por alguna causa que resulte eficaz en derecho para tal renuncia, después de consumada la prescripción extraordinaria.[26]

Por otro lado, se presume que la posesión se sigue disfrutando en la misma forma como se adquirió si no se presenta una prueba contraria.[27]

Con respecto a la interrupción, el Artículo 1843 del Código Civil de 1930[28], específicamente establece que la "posesión se interrumpe para los efectos de la prescripción, natural o civilmente". A tales efectos, se interrumpe civilmente la posesión: (1) por la citación judicial hecha al poseedor, aunque sea por un mandato del tribunal o un juez incompetente; (2) mediante el requerimiento judicial o notarial, siempre que dentro de los dos meses de practicado se presente ante el tribunal o el juez la demanda sobre posesión o dominio de la cosa cuestionada, y (3) por el reconocimiento expreso o tácito que el poseedor haga del derecho del dueño.[29]

## B.

Nuestro ordenamiento jurídico divide los bienes de acuerdo con las personas a quienes pertenecen. En ese sentido, adoptó una norma tripartita, según la cual los bienes pueden ser comunes, de dominio público o de dominio privado.[30]

---

[26] *Adm. Terrenos, v. SLG Rivera Morales*, supra, págs. 28-29.
[27] Artículo 365 del Código Civil de 1930, 31 LPRA ant. sec. 1426; *Bravman, González v. Consejo Titulares*, supra, pág. 840.
[28] 31 LPRA ant. sec. 5264.
[29] *Adm. Terrenos, v. SLG Rivera Morales*, supra, pág. 30; *Bravman, González v. Consejo Titulares*, supra, pág. 840.
[30] *Watchtower Bible et al. v. Mun. Dorado I*, 192 DPR 73, 84 (2014); *San Gerónimo Caribe Project v. ELA I*, 174 DPR 518, 557 (2008).

El Artículo 254 del Código Civil de 1930 describe los bienes comunes como aquéllos "cuya propiedad no pertenece a nadie en particular y en las cuales todos los hombres tienen libre uso, en conformidad con su propia naturaleza: tales son el aire, las aguas pluviales, el mar y sus riberas".[31]

Por su parte, el Artículo 255 dispone que "[s]on bienes de dominio público, los destinados al uso público, como los caminos, ríos, torrentes, y otros análogos".[32] A su vez, el Artículo 256 establece que son bienes de uso público "los caminos estaduales y los vecinales, las plazas, calles, fuentes y aguas públicas, los paseos y las obras públicas de servicio general, costeadas por los mismos pueblos o con fondos del tesoro de Puerto Rico".[33]

Los bienes enumerados en los Artículos 255 y 256 del Código Civil de 1930, *supra,* se complementan con las disposiciones del Artículo 274 del mismo cuerpo legal, que especifica otros bienes que se les puede considerar como de dominio público, aunque no estén específicamente enumerados. Así, el Artículo 274 establece que:

> Entre las cosas que no son susceptibles de apropiación están comprendidas aquellas que no pueden ser propiedad particular por razón de su objeto, tales como las cosas en común o sean aquéllas cuyo uso y disfrute pertenece a todos los hombres.
>
> Hay otras cosas, por el contrario, que aunque por su naturaleza son susceptibles de propiedad particular, pierden esta cualidad como consecuencia de la aplicación que de ellas se hace para fines públicos incompatibles con la propiedad privada, si bien pueden adquirir su primitiva condición tan pronto cese el fin público que se l[e]s hubiera dado; tales son los terrenos de las carreteras, calles y plazas públicas.[34]

Debemos añadir que, contrario a lo que sucede con los bienes privados – que las personas pueden disponer de ellos libremente sin más limitaciones que las impuestas por la ley[35] – los bienes de

---

[31] 31 LPRA ant. sec. 1023.
[32] 31 LPRA ant. sec. 1024.
[33] 31 LPRA ant. sec. 1025.
[34] 31 LPRA ant. sec. 1082.
[35] Artículo 276 del Código Civil, 31 LPRA sec. 1084.

dominio público gozan de una tutela diferente al ser inembargables, imprescriptibles e inalienables. Estos bienes están fuera del comercio porque no se pueden enajenar ni poseer privadamente por disposición de ley.[36]

Al respecto, el Artículo 256 del Código Civil de 1930, *supra*, indica en su segundo párrafo que "[t]odos los demás bienes que el Estado Libre Asociado de Puerto Rico o los municipios posean, son patrimoniales y se regirán por las disposiciones de este título".

A su vez, el Artículo 257 expresa que "[s]on bienes de propiedad privada, además de los patrimoniales del pueblo de los Estados Unidos, del Pueblo de Puerto Rico y de los municipios, los pertenecientes a particulares individual o colectivamente".[37]

El profesor Vélez Torres reseña la diferencia entre los bienes de dominio público y dominio privado del Estado de la siguiente manera:

> Los bienes de propiedad privada son aquellos que, aun perteneciendo al Estado, son susceptibles de tráfico jurídico y están sujetos, en cuanto a su adquisición, disfrute, administración y enajenación a las reglas que, sobre el particular, dicta el Derecho privado vigente. (…)
>
> Los bienes patrimoniales del Estado son poseídos por éste, o por sus subdivisiones políticas, para cumplir con un fin público, pero, a diferencia de lo que ocurre con los bienes de dominio público, el público no tiene constante y general acceso a ellos. (…). Colín y Capitant, distinguiendo entre los bienes de dominio público y los de dominio privado del Estado, se expresan:
>
> "El *dominio privado* comprende los bienes que el Estado posee y administra como un particular, que le producen ingresos, que puede enajenar, por lo menos, en general, y que en nada se diferencian, por lo tanto, exteriormente de las cosas susceptibles de propiedad privada. Una granja modelo, una yeguada, un bosque, una fábrica de tabacos o de cerillas esto es lo que forma parte del dominio privado. El Derecho [C]ivil aparece como el normalmente aplicable a los actos de que estos bienes pueden ser objeto.
>
> "El dominio público, por el contrario… lo forman bienes que sirven para el uso de todos, como los ríos, los

---

[36] *Watchtower Bible et al. v. Mun. Dorado I,* supra, pág. 85; *San Gerónimo Caribe Project v. ELA I,* supra, págs. 558 y 561.
[37] 31 LPRA sec. 1026.

puertos, los caminos, las calles, las plazas públicas. Estos bienes, evidentemente, no están sometidos a las reglas de Derecho [C]ivil concernientes a la propiedad."

Siguen dichos autores, estableciendo diferencias entre el dominio público y el dominio privado del Estado:

1) el dominio público es inalienable; no así el dominio privado del Estado, que puede enajenarse con arreglo a la ley;

2) el dominio público es imprescriptible; el dominio privado, en cambio, puede prescribirse;[38]

3) el dominio público no puede ser gravado con servidumbre o carga alguna; los bienes patrimoniales, en cambio, pueden gravarse;

4) también se ha dicho que el dominio público es inembargable. Pero esta característica no puede distinguirle de los bienes patrimoniales del Estado, que también son inembargables, a base del principio al defecto de que al Estado siempre se presume solvente.[39]

Ahora bien, un bien privado puede transformarse en uno de dominio público, y viceversa, mediante actos de afectación y desafectación.[40] La afectación necesariamente implica que determinado bien ha sido destinado a un fin de interés público particular y puede deducirse de una declaración legislativa o mediante actos administrativos del Estado al amparo de una ley.[41] "Así, podríamos decir que luego de que el legislador advierte una necesidad social, fija los objetivos que constituyen la razón para someter al [dominio público] cierta categoría de bienes".[42]

Por otra parte, un bien cuyo uso es común, por su naturaleza, puede adquirir la clasificación de dominio público, sin que se

---

[38] *ELA v. Tribunal Superior,* 97 DPR [644] (1969); *Rubert Armstrong v. ELA,* 97 DPR 588 (1969). En estos casos se resuelve que, con excepción de terrenos baldíos insulares y terrenos de carreteras y caminos públicos, los bienes patrimoniales del Estado son susceptibles de adquisición por los particulares, mediante la usucapión. Las dos excepciones que se han hecho notar están señaladas en el Código Político, en sus artículos 9 (terrenos baldíos) y 405 (terrenos de carreteras y caminos públicos).

[39] (Nota al calce en el original). José Ramón Vélez Torres, *Curso de Derecho Civil,* cuarta reimpresión, Madrid, Offirgraf, S.A, 2002*, Tomo II,* pág. 42.

[40] *Watchtower Bible et al. v. Mun. Dorado I,* supra, pág. 88*; San Gerónimo Caribe Project v. ELA I*, supra, pág. 558.

[41] *Watchtower et al. v. Mun. Dorado I*, supra, pág. 89.

[42] *Íd.,* pág. 90.

requiera un acto formal de afectación.[43] Asimismo, la doctrina también reconoce la posibilidad de que tenga lugar la afectación de un bien, ello mediante un acto singular del soberano para construir o establecer un inmueble para fines públicos.[44] Por tanto, de lo anterior se puede colegir que:

> [el] carácter de dominio público de un bien, no depende de su naturaleza física o geológica. Lo determinante es su finalidad: el uso público del mismo. *De ahí que un bien, originalmente de dominio público, pueda transformarse en bien patrimonial, susceptible de enajenación, si su uso cesa de ser público".*[45]

Como corolario de lo anterior, un bien afecto a un fin de interés público, puede advenir a ser de carácter privado y, por consiguiente, susceptible de apropiación individual, mediante un acto de desafectación.[46] Esta figura se perfila como la antítesis de la afectación, toda vez que produce el efecto de la pérdida de la clasificación de dominio público del bien objeto de tal acto. Así, para que éste adquiera condición de propiedad particular, se exige que haya cesado el fin que se le hubiere dado.*[47]* Ahora bien, "la desafectación procede del mismo modo en que tuvo lugar la afectación".[48] De este modo, el hecho de que haya cesado el uso público, por sí solo, no resulta suficiente a tal fin.

La mutación dominical correspondiente en virtud de la desafectación exige que medie: (1) un acto soberano, ya sea mediante la aprobación de una ley a tales efectos o mediante un acto administrativo al amparo de los poderes delegados para ello; o, (2) por cambios en la condición natural de los bienes que los excluyan de la clasificación contemplada por la propia ley.[49] "De hecho,

---

[43] *San Gerónimo Caribe Project v. ELA I,* supra, pág. 523; Artículo 255 del Código Civil de 1930, 31 LPRA ant. sec. 1024.

[44] *Watchtower Bible et al. v. Mun. Dorado I,* supra, pág. 90*; San Gerónimo Caribe Project v. ELA I*, supra, pág. 523.

[45] (Cursivas en el original). *Íd.,* pág. 565, citando de M. Godreau y J.A. Giusti, *Las concesiones de la Corona y propiedad de la tierra en Puerto Rico, siglos XVI-XX: Un estudio jurídico*, 62 Rev. Jur. U.P.R. 351, 563 (1993).

[46] *San Gerónimo Caribe Project v. ELA I,* supra, pág. 556-557.

[47] *Íd.,* págs. 565-566.

[48] *Íd.,* pág. 566.

[49] *Íd.,* pág. 567.

nuestro ordenamiento puede requerir una combinación de las modalidades de desafectación para que esta proceda conforme a derecho".[50]

## C.

El mecanismo de sentencia sumaria, regulado por la Regla 36 de Procedimiento Civil[51] permite al tribunal disponer de un caso sin celebrar vista en su fondo.[52]

La Regla 36.1 de Procedimiento Civil[53], establece que una moción de sentencia sumaria debe estar fundada en declaraciones juradas, o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes.[54] Por tanto, el Tribunal podrá dictar sentencia sumaria si de las alegaciones, deposiciones, contestaciones, interrogatorios y admisiones ofrecidas, junto a las declaraciones juradas, si las hubiere, surge que no exista ninguna controversia real sobre los hechos materiales y esenciales del caso y solo resta por resolver una controversia de estricto derecho.[55]

En otro extremo, la sentencia sumaria resulta improcedente cuando: (1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la demanda que no han sido refutadas; (3) surja de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial, o (4) como cuestión de derecho, no proceda.[56]

---

[50] *Íd.,* supra, págs. 567-568.
[51] 32 LPRA Ap. V, R. 36.
[52] *SLG Fernández-Bernal v. RAD-MAN et al.,* 208 DPR 310, 334 (2021); *León Torres v. Rivera Lebrón,* 204 DPR 20, 41 (2020); *Abrams Rivera v. E.L.A.,* 178 DPR 914, 932 (2010); *Nieves Díaz v. González Massas*, 178 DPR 820, 847 (2010); *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010).
[53] 32 LPRA Ap. V, R. 36.1.
[54] *SLG Fernández-Bernal v. RAD-MAN et al.,* supra, pág. 335; *Rodríguez García v. UCA,* 200 DPR 929, 940 (2018).
[55] 32 LPRA Ap. V, R. 36.3(e); *León Torres v. Rivera Lebrón,* supra; *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013); *Mejías et al. v. Carrasquillo et al.*, 185 DPR 288, 299 (2012); *Ramos Pérez v. Univisión*, supra, pág. 214; *González Aristud v. Hosp. Pavía*, 168 DPR 127, 137-138 (2006).
[56] *SLG Fernández-Bernal v. RAD-MAN et al.,* supra, págs. 335-336; *Mejías et al. v. Carrasquillo et al.*, supra, pág. 299; *Corp. Presiding Bishop CJC of LDS v. Purcell,* 117 DPR 714 (1986).

La parte promovida tiene el deber de refutar los hechos alegados, con prueba que controvierta la exposición de la parte que solicita la sentencia sumaria.[57] En este sentido, la parte que desafía una solicitud de sentencia sumaria no puede descansar en las aseveraciones o negaciones consignadas en su alegación. Dicha parte está obligada a controvertir la moción de su adversario de forma tan detallada y específica como lo ha hecho el promovente en su solicitud, ya que, de no hacerlo, corre el riesgo de que de dicte sentencia sumaria en su contra, de proceder en derecho.[58]

Sin embargo, el hecho de que la otra parte no presente prueba que controvierta la evidencia presentada por la parte promovente de la moción de sentencia sumaria, no implica necesariamente que dicha moción procederá automáticamente si realmente existe una controversia sustancial sobre hechos esenciales y materiales.[59]

Asimismo, toda inferencia que se haga de los hechos incontrovertidos debe hacerse de la manera más favorable a la parte que se opone a la misma.[60] A tono con este principio, el Tribunal Supremo ha indicado que, "[a]l considerar la moción de sentencia sumaria se tendrán como ciertos los hechos no controvertidos que consten en los documentos y las declaraciones juradas ofrecidas por la parte promovente."[61]

En el caso de un foro apelativo, este debe utilizar los mismos criterios que el tribunal sentenciador al determinar si procede dictar sentencia sumaria, sin embargo: (1) sólo puede considerar los documentos que se presentaron ante el foro de primera instancia; y

---

[57] *SLG Fernández-Bernal v. RAD-MAN et al.,* supra, pág. 336; *León Torres v. Rivera Lebrón,* supra, pág. 44; *Ramos Pérez v. Univisión*, supra, pág. 215.
[58] *León Torres v. Rivera Lebrón,* supra, pág. 43.
[59] *SLG Fernández-Bernal v. RAD-MAN et al.,* supra, pág. 337.
[60] *Mejías et al. v. Carrasquillo et al.*, supra, pág. 300; *Corp. Presiding Bishop CJC of LDS v. Purcell,* supra, pág. 721.
[61] *Piñero v. A.A.A.*, 146 DPR 890, 904 (1998).

(2) sólo puede determinar si existe o no alguna controversia genuina de hechos materiales y si el derecho se aplicó de forma correcta.[62]

Así pues, por estar en la misma posición que el foro primario al momento de revisar las solicitudes de sentencia sumaria, el Tribunal Supremo de Puerto Rico estableció un estándar específico, que, como foro apelativo, debemos utilizar. A tales efectos, en *Meléndez González, et al. v. M. Cuebas*[63], indicó que, de entrada, debemos revisar que tanto la moción de sentencia sumaria, así como su oposición, cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil.[64] Subsecuentemente, si existen hechos materiales controvertidos, "el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil y debe exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos".[65] Por el contrario, si encontramos que los hechos materiales del caso son incontrovertidos, debemos revisar *de novo* si el foro primario aplicó correctamente la norma jurídica aplicable a la controversia que tuvo ante sí.[66]

Podrá dictarse sentencia sumaria solamente cuando no exista ninguna controversia real sobre los hechos materiales y esenciales del caso[67] y, además, si en derecho procede el reclamo.[68] "[C]uando existe duda sobre si hay o no prueba suficiente o si hay una controversia de hecho, esta duda debe resolverse en favor de la parte promovida"[69].

---

[62] *SLG Fernández-Bernal v. RAD-MAN et al.,* supra, págs. 337-338; *Const. José Carro v. Mun. Dorado*, 186 DPR 113, 129 (2012).
[63] 193 DPR 100 (2015).
[64] *Íd.*, pág. 118.
[65] *Íd.*, pág. 119.
[66] *Íd.*
[67] Un hecho material "es aquel que puede afectar el resultado de la reclamación de acuerdo al derecho sustantivo aplicable". *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010). A su vez, la controversia relacionada a un hecho material debe ser real, "por lo que cualquier duda es insuficiente para derrotar una Solicitud de Sentencia Sumaria". *Íd.*, págs. 213-214.
[68] *SLG Zapata-Rivera v. J.F. Montalvo*, supra.
[69] *Medina v. M.S. & D. Química P.R., Inc.,* 135 DPR, 716, 734 (1994).

Así pues, el mecanismo de sentencia sumaria es un remedio discrecional que procederá solo cuando el tribunal quede claramente convencido de que tiene ante sí documentos no controvertidos, que no existen controversias sobre hechos materiales y esenciales, y que, por lo tanto, lo que resta es aplicar el derecho, ya que una vista en los méritos resultaría innecesaria.[70]

Hay que señalar que una sentencia sumaria, por constituir una decisión en los méritos es el precedente de cosa juzgada[71] cuando se opone entre partes debidamente relacionadas.[72] Por ello, se ha advertido que, antes de resolver una controversia por la vía sumaria, el juzgador habrá de discernir cuidadosamente al respecto, pues "mal utilizada, puede prestarse para despojar a un litigante de su 'día en corte', principio elemental del debido proceso de ley"[73].

**III.**

Al revisar una sentencia sumaria, este foro apelativo intermedio debe examinar si la solicitud de sentencia sumaria, así como su oposición cumplieron con los requisitos de forma que establece la Regla 36 de Procedimiento Civil, *supra*. Este Tribunal revisó la solicitud de sentencia sumaria presentada por el ELA, y la oposición y solicitud de sentencia sumaria presentada por los esposos Almanzar-Ventura. Luego de analizar los escritos, concluimos que ambas partes cumplieron con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil.

El ELA expuso los hechos esenciales e incontrovertidos, debidamente enumerados, así como los documentos que unió a su solicitud en apoyo a sus enunciados. Por igual, los esposos

---

[70] *Vera v. Dr. Bravo*, 161 DPR 308, 334 (2004). Véase, además, *González Santiago v. Baxter Healthcare*, 202 DPR 281, 290 (2019); *Pérez Vargas v. Office Depot*, 203 DPR 687, 699 (2019).

[71] El efecto de la aplicación de la doctrina de cosa juzgada es que la sentencia emitida en un pleito anterior impide que se litiguen posteriormente, entre las mismas partes y sobre las mismas causas de acción y cosas, las controversias ya litigadas y adjudicadas, y aquellas que se pudieron haber litigado. *Mun. De San Juan v. Bosque Real, S.E.,* 58 DPR 743, 769 (2003).

[72] *Vera v. Dr. Bravo*, supra, pág. 335.

[73] *González v. Alicea, Dir. Soc. Asist. Legal,* 132 DPR 638, 646-647 (1993).

Almanzar-Ventura expusieron los asuntos de derecho en controversia que justificaban la resolución sumaria, así como el remedio solicitado.

A su vez, luego de un análisis cuidadoso de los hechos incontrovertidos esbozados por el TPI, concluimos que las determinaciones del foro sentenciador encuentran apoyo en los documentos que obran en autos y no existe controversia genuina de hechos materiales en el caso. Por ello, acogemos las determinaciones de hechos incluidas por el TPI en la *Sentencia* apelada. En consecuencia, corresponde revisar *de novo* si el TPI aplicó correctamente la norma jurídica establecida para la controversia y si procedía, como cuestión de derecho, adjudicar de manera sumaria la controversia.

En específico, el TPI determinó que la prueba documental había establecido la concurrencia de todos los atributos requeridos, mantenidos durante el tiempo y con arreglo a las condiciones que requiere la ley, para configurar la adquisición mediante usucapión extraordinaria a favor de los esposos Almanzar-Ventura sobre el predio objeto de este litigio. El TPI aludió a porciones específicas de la declaración jurada del Sr. Ángel París, en las que éste señaló que "el predio que se describe en la demanda del presente caso perteneció originalmente a mis abuelos paternos, Don Juan De Matta París Ayala y Doña Aquilina Pizarro Escalera, también conocida como Aquilina Pizarro París y como Aquilina Escalera" y que "durante mis años de Infancia, mi abuelo dedicó dicho terreno a la crianza de cerdos, actividad que eventualmente descontinuó aunque permaneció en la posesión del predio hasta que cedió dicha posesión al Sr. Eugenio Monzón, quien operó el Negocio El Gran Chaparral en el lugar por alrededor de 30 años".[74]

---

[74] Véase, Declaración Jurada, Apéndice del recurso, págs. 164-165.

Así también, el TPI resaltó que la Escritura Número 4 mencionaba la existencia de personas ubicadas en la finca objeto de cesión y que no se había presentado evidencia de que hubiera ocurrido una interrupción de la posesión llevada a cabo por los antecesores de los esposos Almanzar-Ventura, como tampoco que se hubiera realizado una acción afirmativa por parte del ELA para reclamar el derecho como dueño del terreno. Por último, concluyó que el ELA no logró establecer que dichos terrenos pertenecían al gobierno federal, ya que el predio está inscrito a favor de la Compañía de Fomento Recreativo. En fin, el TPI concluyó que el ELA no presentó prueba suficiente que controvirtiera la consumación de la usucapión a favor de los esposos Almanzar-Ventura, bajo cualquier análisis que se hiciera en cuanto a las fechas (1910, 1940 o 1979). Por tanto, dictó sentencia mediante la cual declaró con lugar la demanda y, consecuentemente, resolvió que los esposos Almanzar-Ventura son dueños en pleno dominio del predio objeto del litigio, según descrito en el plano de mensura preparado por Pedro Dávila Colón y Joel Nieves (números de licencia 9323 y 3029, respectivamente), que hizo formar parte de la sentencia.

En su apelación, el ELA destacó que según el inciso tres de las condiciones restrictivas de la Escritura de Segregación y Traspaso, Número 4 de 31 de octubre de 1979, los terrenos cedidos a la Compañía de Fomento Recreativo serían dedicados única y exclusivamente para fomentar y desarrollar las metas consignadas en su carta orgánica. Puntualizó que, conforme con la ley habilitadora de la Compañía de Fomento Recreativo y sus sucesoras, se tenía que utilizar el predio con propósitos afines al desarrollo de facilidades recreativas para el disfrute de la ciudadanía. En virtud de ello, arguyó que el predio en controversia forma parte de la finca número 7869, la cual, por disposición de ley, está destinada a un uso público. Siendo así, y ante el hecho de que no ha habido un

cambio en el destino del inmueble, el ELA asegura que la porción de terreno que los esposos Almanzar-Ventura pretenden usucapir no es susceptible de adquisición por prescripción extraordinaria.

A tenor con la normativa jurídica expuesta, el dominio público, lo forman bienes destinados al uso público, que sirven para el uso de todos, como los ríos, los puertos, los caminos, las calles, las plazas públicas. Estos bienes están fuera del comercio porque no se pueden enajenar ni poseer privadamente por disposición de ley. Por el contrario, el dominio privado comprende los bienes que el Estado posee y administra como un particular y de los que puede disponer de ellos libremente sin más limitaciones que las impuestas por la ley. Por ejemplo, una granja modelo o un bosque. Estos bienes patrimoniales del Estado en nada se diferencian de las cosas susceptibles de propiedad privada.

No obstante, un bien originalmente de dominio público puede transformarse en un bien patrimonial susceptible de enajenación si su uso deja de ser público.

La Certificación de la Propiedad Inmueble 2020-013186-CETR, revalida que la finca número 7869 de Loíza consta inscrita a favor de la Compañía de Fomento Recreativo por virtud de la mencionada Escritura Número 4 de 31 de octubre de 1979.[75] Si bien la mencionada Escritura Número 4 establece como condición restrictiva que los terrenos cedidos a favor de la Compañía de Fomento Recreativo serían dedicados única y exclusivamente para fomentar y desarrollar las metas consignadas en su carta orgánica, lo cierto es que los documentos presentados por el ELA no demostraron que, en efecto, la porción de terreno en controversia – o la finca de mayor cabida en la que se encuentra subsumido - estuviera afecta a un uso o servicio público general. Tampoco el ELA

---

[75] *Íd.*, pág. 128.

demostró que constituye la opinión pública y creencia colectiva generalizada y reconocida en la comunidad que los terrenos pertenecen al Estado.

La certificación de zonificación emitida por la Junta de Planificación, del 29 de marzo de 1993, establece, en lo pertinente, que:

> De acuerdo al Mapa de Zonificación de Loíza vigente a la fecha, los terrenos que a continuación se describen radican en un Distrito para Uso Público (P), según se indica en el Mapa que se hace formar parte de esta CERTIFICACIÓN:
>
> Terrenos que radican al Norte de la Laguna Torrecilla y a ambos lados de la Carretera Estatal Núm. 187; y terrenos al Oeste de la Laguna de Piñones hasta colindar con el Distrito Residencial R-0 y desde el Norte de la Carretera Estatal Número 187, cruzando el Canal de Tierra y el Canal del Medio hasta colindar con el Canal Caracoles (límite municipal de Loíza y Carolina) Barrio Torrecilla baja, según lo indicó la parte solicitante de esta CERTIFICACIÓN en carta y mapa sometidos al efecto.
>
> Que dichos terrenos han estado clasificados en la forma antes descrita desde el día 23 de septiembre de 1977, fecha en que entró en vigor el mapa de Zonificación de Loíza adoptado por la Junta de Planificación mediante la Resolución Z-80 del 25 de febrero de 1977.[76]

Ciertamente, la precitada certificación establece el uso público de determinados terrenos, pero no menciona específicamente el predio de terreno objeto del presente caso.

Por igual, el "Modern American Seacoast Defense, A List of Military Reservations and Concrete Gun Batteries 1890-1950" ofrece un inventario general de inmuebles en el que no consta la ubicación específica de la facilidad militar dentro de las fincas descritas en las las escrituras de segregación y traspaso.[77]

Sin embargo, el plano sometido por los esposos Almanzar-Ventura revela que alrededor del predio en controversia operan varios establecimientos comerciales, entre los que se encuentra su

---

[76] *Íd.*, pág. 130.
[77] *Íd.,* págs. 95, 103 y 107.

negocio dedicado a restaurante, el cual colinda con el predio objeto de este caso.[78] Ello demuestra que el área o finca de mayor cabida en la que ubica el predio en controversia no está dedicada a las metas consignadas en la carta orgánica de la Compañía de Fomento Recreativo, sus sucesoras, o a uso público alguno. Añádase a ello que, como cuestión de hecho (número 15) el predio objeto del presente litigio no forma parte de la zona marítimo terrestre ni está afectado por ésta.

El ELA adujo que existen hechos esenciales en controversia que impedían que el caso fuera resuelto mediante sentencia sumaria a favor de los esposos Almanzar-Ventura. En particular, aseguró que el expediente está huérfano de prueba que establezca que los esposos Almanzar-Ventura, en unión a sus predecesores, poseyeran el inmueble de manera pública, pacífica e ininterrumpida en concepto de dueños, según la percepción de la comunidad. Indicó que la declaración jurada del Sr. Ángel Carlos París Escalera lo único que revela es la afirmación del declarante de que sus abuelos eran los dueños del predio de terreno objeto de este caso y a quién se lo cedieron para operar un negocio. Empero, señaló que en esa declaración nada se acredita en cuanto a la creencia colectiva de la comunidad del sector Piñones de que esas personas que allí se mencionan poseyeron el terreno en calidad de dueños, ni surge que la posesión de los que afirman ser dueños del predio fuera pacífica y de manera ininterrumpida. Por lo cual, sostuvo que dicha declaración jurada resulta insuficiente para demostrar el hecho.

En cuanto a la *Contestación a Interrogatorio y Requerimiento de Producción de Documentos* contestado por el Sr. Radamés Almanzar Medina, el ELA esbozó que lo que allí se indicó es lo que proponían declarar los testigos del caso, cuyo contenido prueba de

---

[78] Íd., pág. 167.

referencia carente de valor probatorio, y tampoco contiene evidencia admisible sobre la percepción de la comunidad respecto a la calidad de la posesión del predio por parte de las personas que han estado ocupándolo. Afirmó que, lo único que surge del expediente es un grupo de personas que afirman haber sido dueños del predio objeto de la demanda hasta que la parte apelada lo compró mediante contrato de compraventa privado en el 2012. No tiene razón.

Los documentos que acompañaron la solicitud de sentencia sumaria de los esposos Almanzar-Ventura demostraron que Don Francisco París Pizarro, también conocido como Francisco Javier París Escalera, nació el 3 de diciembre de 1911. Hijo de don Juan de Matas París y doña Aquilina Pizarro, también conocida como Aquilina Escalera.[79] Don Francisco París Pizarro falleció el 2 de junio de 1983.[80] Su cónyuge, doña Gertrudis Escalera, nació el 17 de marzo de 1916 y falleció el 3 de junio de 1983.[81]

Igualmente, Don Francisco París Escalera aparece listado en el Decimoquinto Censo de los Estados Unidos efectuado en 1930, como hijo de los también listados esposos Juan París Ayala y Aquilina Pizarro, todos como residentes del Barrio Torrecilla Baja del Municipio de Loíza; igualmente en el Censo Social y de Población de 1935 efectuado por la Administración de la Reconstrucción de Puerto Rico. Don "Juan Pariz Ayala" así como dona "Aquilina Escalera y Rivera de Pariz" (sic) aparecen también listados en el Censo Decimotercero de los Estados Unidos efectuado en 1910 como esposos y residentes del mismo barrio y municipalidad, en el "camino vecinal que conduce de Loíza a San Juan".[82]

La declaración jurada suscrita por el Sr. Ángel Carlos París Escalera acredita que el predio de terreno objeto del caso perteneció

---

[79] *Íd.,* pág. 194.
[80] *Íd.,* pág. 297.
[81] *Íd.,* págs. 195-196.
[82] *Íd.,* págs. 178-193.

a sus abuelos, quienes lo dedicaron a la crianza de cerdos hasta que se lo cedieron al Sr. Eugenio Monzón y este operó en el lugar el negocio El Gran Chaparral por alrededor de 30 años.[83] El predio está descrito en la demanda y en el plano de mensura que se acompañó con la moción de sentencia sumaria los esposos Almanzar-Ventura; se identifica como Lote A.[84]

Por último, quedó establecido que los esposos Almanzar-Ventura le compraron a la familia Monzón, el predio objeto del presente litigio mediante el "Contrato de Compraventa de Bien Inmueble" suscrito en San Juan, Puerto Rico, el 18 de mayo de 2012. Los vendedores comparecientes en dicho contrato consignaron que adquirieron la propiedad por herencia de su padre, Eugenio Monzón Vázquez, y su madre, Rosario Castro Carrasquillo.[85]

En cuanto a la presunta incongruencia entre la descripción y colindancias del terreno destacada por el ELA se basó en que la representación que consta en el contrato de compraventa difería de la descrita en la demanda en cuanto a que se invirtieron los dueños que colindan al Oeste y al Este del terreno. Sin embargo - como igualmente reconoce el ELA - a requerimiento del tribunal, los esposos Almanzar-Ventura indicaron que la descripción correcta es la del plano sometido, que coincide con la descripción contenida en la demanda. El ELA no cuestionó ni rebatió la precisión de dicho plano.

Nuestro ordenamiento jurídico establece que cuando una parte solicita sentencia sumaria e incluye con su moción prueba para demostrar que no existe controversia sustancial sobre los hechos del caso, corresponde a la otra parte establecer que existe

---

[83] *Íd.,* págs. 164-165.
[84] *Íd.,* págs. 4-5 y 166-168.
[85] *Íd.,* págs. 170-172.

una controversia real al menos sobre un elemento de la causa de acción, ofrecer prueba sobre alguna de sus defensas afirmativas, o presentar prueba que refute la credibilidad de los documentos en apoyo a la solicitud de sentencia sumaria. Así que, ante la moción presentada por el ELA correspondía a los esposos Almanzar-Ventura rebatir vía declaraciones juradas u otra documentación que apoyara sus alegaciones, lo que así hicieron.

La prueba documental anejada a los escritos en solicitud de sentencia sumaria demostró que, para el 31 de octubre de 1979, la Compañía de Fomento Industrial figuraba como titular registral de una parcela de terreno conocida como "Battery Lancaster" compuesta de 15.53 cuerdas e inscrita a su favor al folio 192 del tomo 3 de Canóvanas, finca número 7441, según los datos de inscripción en dicho momento. En la fecha mencionada, la Compañía de Fomento Industrial segregó una finca de 3.3884 cuerdas, la cual se denominó Parcela "A" en el plano de segregación, quedando un remanente de 12.1416 cuerdas, el cual se denominó Parcela "B" en el plano de segregación, todo ello según consta en la Escritura Número Cuatro (4) de 31 de octubre de 1979, otorgada en San Juan ante el notario Enrique Adsuar Lores. Mediante dicha Escritura Número 4, la Compañía de Fomento Industrial cedió la Parcela "A" a favor de la Compañía de Desarrollo Comercial de Puerto Rico y el remanente, o sea, la Parcela "B", lo cedió a favor de la Compañía de Fomento Recreativo. Dicha Parcela "B" corresponde a la finca número 7869, inscrita a favor de la Compañía de Fomento Recreativo al folio 161 del tomo 147 de Loíza, Registro de la Propiedad de Carolina, Sección Tercera. Dentro de dicha finca 7869, se ubica el predio objeto del presente litigio.

También la prueba acreditó que don Juan de Matta París y su esposa doña Aquilina; don Francisco París Pizarro y su esposa doña Gertrudis Escalera; y la familia Monzón, mantuvieron

sucesivamente la posesión continua del predio objeto del presente litigio, desde antes de 1910 y hasta 2012, en concepto de dueños, pública, pacífica e ininterrumpidamente. Al inicio del siglo pasado era usado para la crianza de cerdos por el Sr. Juan de Matta y su esposa, pasando luego a su hijo Francisco Paris, quien lo cedió a la familia Monzón. Dicha familia lo vendió a los esposos Almanzar-Ventura quienes, han mantenido y continuado la posesión desde 2012 y hasta el presente.

Las alegaciones esbozadas por el ELA en el recurso de epígrafe no constituyen prueba suficiente para controvertir los hechos materiales que presentaron los esposos Almanzar- Ventura y la prueba documental sometida. La prueba documental sometida por ambas partes dejó establecido que la posesión en concepto de dueño, pública, pacífica e ininterrumpidamente tanto de los esposos Almanzar- Ventura como de sus predecesores, constituye la opinión pública y creencia colectiva generalizada y reconocida en la comunidad. Ciertamente - tal y como resolvió el TPI - estimando el año 1910 como el de inicio de las posesiones sucesivas ininterrumpidas de los esposos Almanzar- Ventura y sus predecesores posesorios, se puede concluir que la usucapión se consumó en 1940; ganada por su poseedor de entonces, transmitida posteriormente a la Familia Monzón y finalmente, mediante cesión por compraventa en el 2012 a esposos Almanzar- Ventura.

A su vez, en 1979, cuando se otorgó la Escritura Número 4 antes mencionada, se reconoció la presencia de poseedores en dicha finca y que éstos reclamaban derechos sobre estas tierras, lo que vaticinaba la posibilidad de que parte de éstos fueran cedidos o enajenados a favor de terceros, incluido el sector privado. Así que, incluso si se tomara esa fecha como inicio del término de 30 años para la usucapión sobre un bien patrimonial de uso público, susceptible de adquisición por particulares mediante la

usucapión[86], la misma se consumó a favor de la familia Monzón en el año 2009, tres años antes de éstos haber vendido su propiedad a los esposos Almanzar- Ventura, quienes han estado en posesión de ésta en concepto de dueños hasta el día de hoy.

En virtud de lo anterior, actuó correctamente el TPI al dictar sentencia sumaria declarando con lugar la demanda y resolver que los esposos Almanzar-Ventura son dueños en pleno dominio del predio objeto del litigio, según descrito en el plano de mensura preparado por Pedro Dávila Colón y Joel Nieves (números de licencia 9323 y 3029, respectivamente), que hizo formar parte de la sentencia. en consecuencia, procede confirmar el dictamen apelado.

**IV.**

Por los fundamentos que anteceden, confirmamos la *Sentencia Sumaria* apelada.

**Notifíquese.**

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[86] *Rubert Armstrong v. ELA,* supra.